# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 3160 | **DATE** | 4/29/2003 |
| **CASE TITLE** | Larimer vs. International Business Machines Corporation | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's motion to strike affidavit of Thomas Larimer and all materials purporting to rely on the affidavit [41-1] is granted in part and denied in part. Plaintiff's motion to strike certain portions of defendant's reply to summary judgment [48-1] is denied. Enter Memorandum Opinion and Order. Defendant's motion for summary judgment [30-1] is granted. All future dates, including trial date of May 19, 2003, are stricken. Case is terminated.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | 2 | **Document Number** |
| | No notices required. | | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | MAY 0 1 2003 | |
| | Notified counsel by telephone. | | | date docketed | |
| | Docketing to mail notices. | | | | 52 |
| ✓ | Mail AO 450 form. Mailed by MD. | | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | 4/29/2003 | |
| | | | | date mailed notice | |
| DM | courtroom deputy's initials | | | MD | |
| | | | | mailing deputy initials | |

JUDGE LEFKOW'S COURT

03 APR 30 AM 5: 05

FILED-ED 10

Date/time received in central Clerk's Office

| | | |
|---|---|---|
| THOMAS LARIMER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 02 C 3160 |
| | ) | Judge Joan H. Lefkow |
| INTERNATIONAL BUSINESS MACHINES, | ) | |
| CORPORATION, successor in interest to | ) | |
| LOTUS DEVELOPMENT CORP., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

DOCKETED
MAY 0 1 2003

## MEMORANDUM OPINION AND ORDER

Before the court are motions of plaintiff and defendant to strike certain portions of the materials presented in support of and in opposition to summary judgment. Defendant, International Business Machines Corporation ("IBM") moves to strike the affidavit of plaintiff, Thomas Larimer ("Larimer"), and all materials purporting to rely on that affidavit. Larimer moves to strike certain portions of IBM's reply to Larimer's summary judgment response. For the reasons set forth below, IBM's motion is granted in part and denied in part and Larimer's motion is denied.

### A.    IBM's Motion to Strike Larimer's Affidavit

IBM first moves to strike portions of Larimer's affidavit on grounds that certain statements made therein contradict Larimer's earlier, sworn deposition testimony. As the Seventh Circuit has stated,

> Affidavits, though signed under oath by the affiant, are typically and here written by the affiant's lawyer, and when offered to contradict the affiant's deposition are so lacking in credibility as to be entitled to zero weight in summary judgment

*52*

proceedings unless the affiant gives a plausible explanation for the discrepancy. *Beckel* v. *Wal-Mart Assoc., Inc.*, 301 F.3d 621, 623 (7th Cir. 2002). Any such explanation "must come in the affidavit itself, not in lawyer's musings, which are not evidence." *Id.*

IBM begins its assault on Larimer's affidavit with paragraph 9. There Larimer states that "Prior to being hired by IBM, I worked at other similar jobs and had success as a salesman." IBM claims that this contradicts portions of Larimer's deposition, where Larimer testified that he had held a variety of other sales positions at such companies as Midwest Visual Communications, Tandberg, and Lucent Technologies, Inc., in which he had good as well as bad years, got along with his supervisors when he was selling and did not when he was not selling, and was criticized for failing to make his quota, respectively. Larimer's saying that he had success as a salesman is not necessarily inconsistent with his statements that he had good as well as bad years and that he was in some situations criticized for failing to make his quota; the affidavit will not be stricken; nevertheless, the two statements together are read as stating that the success (a relative term) was less than unequivocal. Accordingly, the court denies the motion to strike paragraph 9.

IBM next argues that paragraph 33 should be stricken. There Larimer stated, "This [performance] 'plan' required me to perform impossible and impractical activities, which did not and could not have assisted me in making additional sales." IBM argues that this contradicts Larimer's deposition testimony, where he stated that there were not any goals in those requirements that were impossible to meet. Larimer testified at his deposition that, while he expressed the difficulty in accomplishing the goals, he did, in fact, state that he was capable of reaching them and specifically said "[a]t that particular time, I don't think there were any that

were impossible to meet." (Larimer dep. at 279.) As the affidavit is inconsistent with the deposition testimony, the court strikes paragraph 33 of Larimer's affidavit.

Next up for IBM is paragraph 35 of Larimer's affidavit, which states, "To my knowledge, no other employees were put on this plan–even those whose sales and performance were inferior to mine." IBM believes this contradicts Larimer's deposition testimony where Larimer stated that he did not know how his performance compared with the other salespeople in his group. Larimer points out, however, that the deposition testimony refers to the first quarter that Larimer worked at IBM, a full six months before the performance review time frame referenced in paragraph 35. The court agrees. As such, no contradiction is present and the motion to strike this paragraph is denied.

IBM also argues that paragraphs 25 through 28 of Larimer's affidavit should be dismissed. Those paragraphs read as follows:

> 25. Prior to June 21, 2001, I never received a verbal warning or serious criticism regarding my job performance.
> 26. Prior to arranging the June 21, 2001 severance meeting, I never received a written warning or serious criticism regarding my job performance.
> 27. Prior to the complications with Juliann's pregnancy, I was often early to work, often stayed late, did not take or request vacations, and fulfilled all my existing responsibilities.
> 28. On June 21, 2001, my supervisor at the time, John Freimark, called a meeting with me and verbally communicated for the very first time that I was not performing adequately.

IBM maintains that these statements are contradictory because Larimer admits he received a score of 3 on a scale of 1 to 4–with 1 being the highest–on his January 2001 review. Moreover, Larimer does not dispute that Mary Freeman told Larimer he was relying too heavily on others and not taking enough initiative, that a buddy system was developed in an effort to help him, and

that John Freimark was negative toward him concerning the manner in which Larimer handled a transaction with Kemper. To the extent these paragraphs attempt to characterize what IBM supervisors thought of plaintiff's work, they are disregarded. To the extent they merely express Larimer's opinion of his own work they are considered. The motion to strike is denied.

Next, IBM argues that paragraph 30 should be stricken. In paragraph 30 Larimer states "One example of this is that, on the date that Mr. Freimark criticized my lack of sales, he knew that, on this date, I generated [a] $600,000 sale to Aon Corporation." IBM maintains that Larimer only admitted in his deposition that he informed Freimark that he had received a verbal–not written–acceptance of a sale at Aon and that he was still forecasting it as a ten percent opportunity. Larimer's deposition specifically reads as follows: "I communicated to John [Freimark] that I had just received a verbal acceptance of a–one of my opportunities with Aon, a rather large sale I had been chasing." (Larimer dep. at 231.) While the court can only presume that IBM's attempt to strike this portion of the affidavit is to point out the distinction that the sale was at that time only a verbal acceptance, it sees the distinction but denies the motion to strike.

IBM next attacks paragraph 32, where Larimer stated "In the discussion of these options, Mr. Freimark specifically mentioned my special health insurance concerns and said that the severance package option would best meet those concerns." Larimer's deposition includes the following interchange:

> Q: During the meeting, did Mr. Freimark specifically address your special health insurance concerns and advocate that the severance package option would best meet those concerns?
> A: Yes, his commentary was just that. . . .

(Larimer dep. at 270.) Because the two statements are consistent, the motion to strike paragraph

4

32 of the affidavit is denied.

IBM moves on to paragraph 29, which states, "During the meeting, Mr. Freimark made comments about my performance which were untrue and irrelevant and that ignored my successes." IBM argues that this is somehow in contradiction to Larimer's admission that he was searching something referred to as "CRISP" for revenue, an area in that Freimark had criticized Larimer during this meeting. There is no contradiction here and the motion to strike is denied.

IBM moves to strike paragraph 21 of the affidavit because it refers to Larimer's twins as being born three months prematurely when, in fact, the twins were born 11 weeks and 1 day prematurely. Without inquiring as to whether it is really worth the court's time to address such minor differences, the court will strike paragraph 21 to the extent it refers to three weeks and will credit IBM's version at 11 weeks and 1 day.

IBM next moves to strike paragraphs 10-13, 16, 23-24, 36 and 39-43 of Larimer's affidavit because the statements are conclusional and constitute opinions. The paragraphs in dispute state as follows,

> 10. According to IBM documents, in the Chicago office, I was the most successful employee in terms of attaining the product sales quotas set for me.
> 11. According to IBM documents, in the Midwest region, I was third of 28 employees in product quota attainment.
> 12. According to IBM documents, in all of North, Central, and South America, I was 9th of 157 in product quota attainment.
> 16. In August 2001, I was one of a limited number of sales representatives who received a performance bonus for my June 2001 sales activities.
> 23. IBM knew about Juliann's difficult pregnancy, the twins' premature birth, their conditions, and the large medical expenses incurred and to be incurred.
> 24. At the time, Lotus was experiencing some financial difficulties.
> 35. To my knowledge, no other employees were put on this plan—even those whose sales and performance were inferior to mine.
> 36. On July 25, in answer to the needs of my children, who were undergoing numerous procedures and testing, I requested two weeks of parenting leave—a

standard request that is routinely granted.

39. In fact, I did not receive any substantive parenting leave.

40. On August 17, 2001, my attorney sent a letter to IBM stating that I was discriminated against due to my children's disabilities and requesting a "Panel Review" as provided by the company's employee handbook.

41. IBM's attorney denied this request even though it is mandated and not optional.

42. IBM later relented and gave me a "Panel Review."

43. During this "Panel Review," IBM Corp. actively misrepresented my job performance and wrongly persuaded the Panel that I did not adequately perform my job.

Under Rule 56(e), Fed. R. Civ. P., affidavits offered in opposition to summary judgment are required to "be made on personal knowledge, . . . set[ting] forth such facts as would be admissible in evidence, and . . . show[ing] affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e); *Drake* v. *Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998). Starting with 10 through 13, Larimer claims that these paragraphs are based on his personal knowledge and are verified by documents that IBM included in its own summary judgment appendix. Reference generally to documents to support a fact does not comply with Rule 56.1(a), which requires each statement of material fact to include "specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph." Nowhere in his affidavit does Larimer specifically cite the documents on which he relies. In response to IBM's motion to strike, Larimer attaches certain documents, but again without any foundational basis, setting out the author of the documents, the context in which they were generated, the date, or any information from which the court might draw reasonable inferences. The court strikes paragraphs 10-13 of Larimer's affidavit.

As for paragraphs 16, 23-24 and 36, Larimer claims that these paragraphs, once again, are

based on his personal knowledge. The court has no question that part of 36 is within Larimer's personal knowledge and is not speculation, as Larimer certainly knows whether he requested two weeks of parenting leave. It is less clear, however, that this is a standard request that is routinely granted. No foundation is laid for precisely how Larimer is aware of this or if this is, in fact, the case. Therefore, the final 7 words of the sentence are stricken.

Moving on to 23, IBM does not really dispute that it was aware of the health conditions of the twins and the medical expenses that would have to be incurred, thus, the court will not strike this testimony. As for 24, Larimer does not present the foundation for how he was aware of Lotus's financial difficulty and how it is more than speculation on his part, so the court will strike 24. The court will not strike 16 to the extent it asserts that Larimer received a performance bonus. The rest of the sentence lacks foundation and is stricken.

Last, dealing with 39-43, the motion is denied as to paragraph 39, as it appears to be within Larimer's personal knowledge. Paragraph 40 asserts facts that may be within Larimer's knowledge, but the contents of the letter are hearsay and therefore disregarded. Paragraph 41, again, is presumably undisputed insofar as it asserts that the request was denied. To the extent the paragraph asserts that a Panel Review was mandated and not optional, Larimer has not established a foundation and the assertion is stricken. To the extent Paragraph 42 merely asserts that IBM gave Larimer a Panel Review it may stand; whether or not IBM relented is irrelevant and disregarded. The court strikes 43 because it is nothing more than an opinion by Larimer that IBM actively misrepresented his job performance and wrongly persuaded the Panel that he did not adequately perform his job. If Larimer believes misrepresentations were made, he must specifically point them out by reference to the record.

Finally, IBM moves to strike paragraph 22 of Larimer's affidavit because this evidence was not provided by Larimer during discovery and because this paragraph is irrelevant. In paragraph 22, Larimer states that his daughter Emelia is "now under the care of the State of Illinois developmental system." IBM argues that it asked for in discovery any information about the children's illnesses and this information was not provided. Moreover, IBM states that if this information has just become available, Larimer had a duty to amend discovery to bring such evidence forth. Larimer responds that this development just occurred when he filed his response to IBM's motion for summary judgment, and that Rule 26(e), Fed. R. Civ. P., does not state that a prior request for production be amended "immediately." Inasmuch as Larimer asserts that he will amend his interrogatory answers and document production to reflect this development, the court will not strike this paragraph on this ground.

Addressing the relevance issue, IBM argues that any recent care or diagnosis Emelia has received from the State of Illinois developmental system is not relevant because it does not speak to whether Emelia was disabled at the time of the relevant employment decision. The court agrees with IBM that this post-employment fact is irrelevant to the case because it does not bear on whether IBM viewed the children as disabled when it terminated Larimer.

**B.    Larimer's Motion to Strike Portions of IBM's Reply**

Larimer moves to strike IBM's "Appendix in Support of its Summary Judgment Reply," which contains three written statements styled as declarations, and IBM's reply to Larimer's 56.1 statement of facts. Larimer contends that it was improper for IBM to reply to Larimer's responses to IBM's statement of material facts. Larimer argues that no such reply is allowed under the Local Rules, and that the declarations are no more than an attempt to improperly offer

new evidence at this stage of case.

A reading of the Local Rules does not support Larimer's argument. Local Rule 56.1(b) allows an opposing party to file a response to each numbered paragraph presented by the moving party and to provide a statement of additional facts requiring denial of summary judgment. Under Local Rule 56.1(a)(3), "[i]f additional material facts are submitted by the opposing party pursuant to section (b), the moving party may submit a concise reply in the form prescribed in that section for a response." The form prescribed in paragraph (b) is through "affidavits and other materials referred to in Fed. R. Civ. P. 56(e)." Since, in some instances, additional material facts were submitted in Larimer's response to IBM's statement of material facts, the Local Rules properly allow for the reply that IBM submitted. Moreover, since the form prescribed by (b) includes affidavits, IBM could properly introduce the declarations at this time in its appendix. Accordingly, Larimer's motion to strike is denied.

## CONCLUSION

As stated above, IBM's motion to strike is granted in part and denied in part [#41] and Larimer's motion to strike is denied [#48].

ENTER: _Joan H Lefkow_

JOAN HUMPHREY LEFKOW
United States District Judge

Dated: April 29, 2003

THOMAS LARIMER,  )
  )
Plaintiff,  )
  )
vs.  )   No. 02 C 3160
  )   Judge Joan H. Lefkow
INTERNATIONAL BUSINESS MACHINES,  )
CORPORATION, successor in interest to  )
LOTUS DEVELOPMENT CORP.,  )
  )
Defendant.  )
  )

DOCKETED
MAY 0 1 2003

## MEMORANDUM OPINION AND ORDER

In this action filed by plaintiff, Thomas Larimer ("Larimer"), alleging discrimination

based on association in violation of the Americans With Disabilities Act ("ADA"), 42 U.S.C.

§§ 12101 *et seq.* (Count I), and termination in violation of § 510 of the Employee Retirement

Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* (Count II), defendant,

International Business Machines, Corporation ("IBM"), has moved under Rule 56, Fed. R. Civ.

P., for summary judgment. The court has jurisdiction over the claims pursuant to 28 U.S.C.

§ 1331, 29 U.S.C. § 1132(a)(3) and 42 U.S.C. § 2000e-5(f). For the reasons set forth below, the

motion for summary judgment is granted.

### SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and

assess the proof as presented in depositions, answers to interrogatories, admissions, and

52

affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## FACTS STATED IN A LIGHT MOST FAVORABLE TO PLAINTIFF

On August 17, 2001, Larimer was fired from his employment at IBM. Previously, on May 11, 2001, Larimer's wife, Juliann, gave birth to Larimer's twin daughters, Emelia and Sarah Larimer, who were born prematurely and suffered from numerous medical conditions listed below. Larimer maintains that his firing was based on his children's alleged disability in violation of the ADA. In addition, Larimer alleges that he was terminated because he filed health care claims on behalf of his daughters, who were covered under the health plan IBM provided to Larimer, in violation of § 510 of ERISA.

**Larimer's Employment at IBM**

The Lotus Software Sales unit of IBM employed Larimer as a Senior Sales Specialist in Chicago from August 28, 2000 through August 17, 2001. (Def. L.R. 56.1 ¶ 4.) Prior to being

2

hired by IBM, Larimer held a variety of other sales positions at companies such as Midwest Visual Communications, Tandberg, and Lucent Technologies. (Def. L.R. 56.1 ¶ 7.) Larimer was hired by IBM based on a favorable interview process, checked references, and a comparison to other individuals interviewed for the position. (Pl. L.R. 56.1 ¶ 1.) As a Senior Sales Specialist, Larimer was assigned to specific accounts and was responsible for selling Lotus software messaging products and software knowledge management products to those accounts. (Def. L.R. 56.1 ¶ 8.)

At the time of his hire until sometime in the beginning of 2001, Larimer was supervised by District Manager Mary Freeman ("Freeman"). (Def. L.R. 56.1 ¶ 9.) Larimer and Freeman had a good working relationship and Freeman had no bad experiences or exchanges with Larimer while she managed him or afterwards. (Pl. L.R. 56.1 ¶ 2.)

From August through November 2000, Larimer was in an orientation period at IBM during which, regardless of his productivity, he was paid as if he met his sales goals. (Def. L.R. 56.1 ¶ 10.) Beginning in December 2000, Larimer was subject to real sales goals that affected his compensation. (Def. L.R. 56.1 ¶ 10.) Larimer's sales goals were broken into two parts – a service component and a product component. (*Id.*) Larimer did not believe that he met the services part of his goal in December 2000. (*Id.*) Larimer received his first performance evaluation (referred to as his Personal Business Commitments ("PBC")), for the period ending December 31, 2000. (Def. L.R. 56.1 ¶ 13.) He received an overall rating of "[a]chieved some/most commitments"– a 3 on a scale of 1 to 4 with 1 being the highest. (*Id.*) This PBC, which was given by Freeman, stated that Larimer had fallen just short of his December goals. (*Id.*) Freeman believed that Larimer was having difficulty making the transition from his work at

Lucent to his work at IBM and demonstrated frustration in coming up to speed with the technologies. (Def. L.R. 56.1 ¶ 14.) Freeman also believed that Larimer was "not taking enough initiatives of his own in aggressively engaging with his account set." (Pl. Resp. to Def. L.R. 56.1 ¶ 14.)

In early 2001, John Freimark ("Freimark") replaced Freeman as Larimer's supervisor following Freeman's promotion into the position of acting and then Regional Director of the MidWest West Sales Region.[1] (Def. L.R. 56.1 ¶ 9.) Freimark "picked" Larimer to be on his sales team under his management because Freimark knew the accounts Larimer would be covering based on Freimark's prior sales experience and because he knew Larimer's wife, Juliann, also an IBM employee, and believed that she would be of assistance to Larimer. (Def. L.R. 56.1 ¶ 16.) Larimer had previously gotten along well with Freimark when both held the position of sales representative and Larimer welcomed the change in supervision. (Def. L.R. 56.1 ¶¶ 12, 16.)

Larimer believed that he and other salespeople received more attention from Freimark than they had received from Freeman. (Def. L.R. 56.1 ¶ 18.) Larimer testified that he and Freimark got along "okay" when he began reporting to Freimark and that there "was always a position of, again, critiquing successes and failures . . . ." (Def. L.R. 56.1 ¶ 20.) On January 19, 2001, Larimer provided Freimark with his initial first quarter sales forecast. (Def. L.R. 56.1 ¶ 21.) Larimer set forth his goals of earning $200,000 in 2001, achieving 200% of his sales quota in 2001 and 100% of his quota by July 2001, understanding and becoming proficient in

---

[1] At or around the time Freimark was promoted, he began a six-month long training course at IBM (completed in August 2001) that included training on IBM's discrimination policies–including the ADA. (Def. L.R. 56.1 ¶ 19.)

communicating the benefits of all Lotus products, and understanding the internal tools and processes of Lotus/IBM.[2] (Def. L.R. 56.1 ¶ 21.) As of January 2001, Larimer admitted that he was still working toward understanding the internal tools and processes of IBM as many had changed throughout his employment and that he was still learning about new products that were offered. (*Id.*; Pl. Resp. to Def. L.R. 56.1 ¶ 21.)

On or about April 4, 2001, Larimer attended a regional sales meeting in Milwaukee, Wisconsin. (Def. L.R. 56.1 ¶ 24.) In attendance were members of Larimer's sales team (including managers Freeman and Freimark) as well as other managers and sales engineers who were involved in Larimer's team business. (*Id.*) Larimer reviewed his first quarter bookings and presented an account plan. (*Id.*) He admitted that at this time he was not at the point of reaching his goals. (Def. L.R. 56.1 ¶ 25.) Larimer had, in fact, changed his goals in his April 2001 presentation from meeting 200% of his assigned quota to meeting only 150% of the quota. (Def. L.R. 56.1 ¶ 26.)

After the April 4 presentation, Freimark realized that Larimer did not seem to understand what the critical business issues were for his accounts, why the customer was buying the product, what the value was that he was trying to sell, and what vision he was creating for the customer. (Def. L.R. 56.1 ¶ 26.) Freeman also realized after Larimer's presentation that his performance was not where it needed to be. (*Id.*) Following the April 4 meeting, Freimark began having weekly telephone conversations with Larimer to discuss Larimer's sales opportunities and strategies. (Def. L.R. 56.1 ¶ 28.) Freimark also established a buddy system whereby sales

---

[2]The amount of Larimer's quota varied throughout his employment. (Def. L.R. 56.1 ¶ 22.) Toward the end of his employment, Larimer's quota was to sell approximately $1.2 million in products and $1 million in services. (*Id.*)

specialists Greg Fancher ("Fancher") and Vince Peseski ("Peseski") provided additional guidance and informal assistance to Larimer. (Def. L.R. 56.1 ¶ 29.)

On April 16, 2001, Freimark sent an e-mail to Larimer indicating that he had not seen any of Larimer's expense reports. (Def. L.R. 56.1 ¶ 31.) Larimer responded on April 17, 2001, saying that he "need[ed] to get caught-up" and that he would work on them that night. (*Id.*) Larimer did not complete the reports until the summer of 2001, which Larimer attributed to a new computer system being implemented. (Pl. Resp. to Def. L.R. 56.1 ¶ 31.)

In late May or early June 2001, Larimer noticed a "definite change in tone and attitude in one case specifically" with regard to his relationship with Freimark. (Def. L.R. 56.1 ¶ 33.) Freimark had become interested in a particular opportunity at Kemper Insurance, one of Larimer's accounts. (*Id.*) Freimark was "very interested" in Larimer's quote of some software to Kemper and was critical of Larimer for delivering the quote on the Friday before Memorial Day to a lower ranking individual at Kemper. (Def. L.R. 56.1 ¶ 34.)

On June 21, 2001, Freimark held a meeting with Larimer in Chicago. At the meeting Larimer informed Freimark that he had just received a verbal (not written) acceptance of a sale that he had been "chasing" at Aon, although he was still forecasting it as a ten percent opportunity. (Def. L.R. 56.1 ¶ 37.) Larimer believed that approximately $400,000 of the anticipated sale would come from the sale of licenses and that an additional $100,000 of the anticipated sale would come from subscriptions. (*Id.*) Freimark was critical of Larimer's performance relating to the Aon account. (Def. L.R. 56.1 ¶ 38.) Specifically, Freimark had been coaching Larimer for months on how to turn what amounted to a compliance sale (i.e., working with IBM's compliance team to legally require Aon to buy a sufficient number of licenses for the

6

product to cover Aon's use of the product) into a situation in which Larimer could wrap compliance into the sale of additional products and services and utilize the solution selling model, which Larimer did not do. (*Id.*) Larimer also recalls Freimark being critical in a negative manner of Larimer's handling of opportunities at ABN-AMRO. (Def. L.R. 56.1 ¶ 39.)

At this meeting Larimer recalls further criticism from Freimark, including that Freimark criticized Larimer for "selling on price," *i.e.*, selling the product as cheaply as possible rather than selling the quality of the product, that Larimer was "spending [his] time looking through the company books for what had sold and taking credit for it," and for not being able to sell product solutions to his customers. (Def. L.R. 56.1 ¶ 41.) Freimark went on to explain to Larimer that he was being offered the opportunity to leave IBM with a separation package or be placed on a "performance plan" because Larimer had a lack of "pipeline" (*i.e.*, a lack of a pipeline of prospective sales), and did not have access to people in authority at his accounts. (Def. L.R. 56.1 ¶ 40.) Specifically, Larimer was offered the choice between a severance package, which offered him the opportunity to receive a satisfactory rating, outplacement services, two months of salary, and the continuation of health insurance for six months, or a performance plan which Freimark informed Larimer he believed to be "not doable." (Def. L.R. 56.1 ¶¶ 43, 45.) Larimer had 30 days to decide which option to take, and understood that if he accepted the plan option and did not meet its requirements, his employment would be terminated. (Def. L.R. 56.1 ¶¶ 44, 45.) At this meeting, Freimark stated that he knew that health insurance was important for Larimer, and Larimer took this to mean that Freimark was implying that the severance package would best meet his health coverage concerns. (Def. L.R. 56.1 ¶ 46.)

During the 30-day period in which Larimer had to consider the separation agreement, he was placed on a "pre-performance" plan. (Def. L.R. 56.1 ¶ 48.) Larimer believed that there were no goals under this pre-performance plan that were impossible to meet. (*Id.*) Moreover, Larimer submitted, with the exception of one week, completed forms on a weekly basis which related to his various accounts. (Def. L.R. 56.1 ¶ 49.) Larimer believes that he fulfilled his goals under the pre-performance plan. (*Id.*)

At the end of the 30-day period, Larimer informed IBM's Human Resources department that he was not going to accept the separation agreement and that he was going to try the performance plan. (Def. L.R. 56.1 ¶ 51.) Larimer stated that he decided to not accept the separation plan because he believed that he was closing in on some opportunities he was pursuing as well as meeting Freimark's specific requirements. (*Id.*)

On July 25, 2001, Larimer requested two weeks of parenting leave. (Pl. L.R. 56.1 ¶ 17.) IBM denied the request for a two-week leave and instead allowed one week of parenting leave. (Def. Resp. to Pl. L.R. 56.1 ¶ 18.) During this leave, Larimer was required to conduct business, meet his performance plan requirements, and was constantly contacted by Freimark and others to attend IBM business. (Pl. L.R. 56.1 ¶ 19.) At some point in August 2001, Larimer received a bonus for sales achieved in June 2001. (Pl. L.R. 56.1 ¶ 6.)

On August 9, 2001, Larimer attended the next regional sales meeting, where he prepared an account plan based on a format that was recommended to him by Freimark. (Def. L.R. 56.1 ¶ 55.) During his presentation, Larimer received questions from two other salespeople, Fancher and Stephanie McDaniel ("McDaniel"). (Def. L.R. 56.1 ¶ 56.) Larimer attributes Fancher and McDaniel's questioning to ill-will and believes that management asked McDaniel to interfere

8

with the completeness of his presentation. (*Id.*) Following the meeting, McDaniel received a reduction in her assigned product sales quota. (Pl. Resp. to Def. L.R. 56.1 ¶ 56.)

After Larimer's presentation, Freimark realized that Larimer "was not getting it yet." (Def. L.R. 56.1 ¶ 58.) According to Freimark, Larimer was self-critical in his presentation by stating that he knew he had to make improvements and did not give the full presentation that Freimark had helped prepare. (*Id.*) Freeman agreed that Larimer did not understand his customers or their critical business needs. (*Id.*)

Over the next few days, the decision was made to terminate Larimer's employment. (Def. L.R. 56.1 ¶ 59.) In addition to Larimer's showing at the August 2001 meeting, Freimark believed that the following contributed to Larimer's termination: (1) he failed to provide six solution selling bargain letters or pricing proposals to customers; (2) he failed to establish the services engagements at his accounts; (3) he failed to turn in his required paperwork on time or completed; and (4) he failed to fully understand the solution selling model. (Def. L.R. 56.1 ¶ 59.) On August 17, 2001, Larimer was informed of his termination in a meeting with Freimark and Lori Harman, the manager of the sales engineers. (Def. L.R. 56.1 ¶ 61.)

**Larimer's Twin Daughters**

On May 11, 2001, Larimer's twin daughters, Emelia and Sarah, were born at 28-6/7 weeks gestation. (Def. L.R. 56.1 ¶ 88.) The birth weights of Emelia and Sarah were 1225 and 1060 grams respectively. (Pl. L.R. 56.1 ¶ 31.) Both the children suffered from the following conditions:

> • Respiratory distress syndrome (a lung problem characterized by the
> inability to make a substance called surfactant) from May 11, 2001 through

May 15, 2001 (Emelia) and May 11, 2001 through May 22, 2001 (Sarah), at which times the conditions resolved.

- Suspected sepsis (a degree of suspicion for infection) from May 11, 2001 through May 14, 2001 (Emelia) and May 11, 2001 through May 13, 2001 (Sarah) at which times the suspected condition resolved.
- Hyperbilirubinemia of prematurity (jaundice) from May 12, 2001 through May 23, 2001 (Emelia) and May 11, 2001 through June 7, 2001 (Sarah), at which times the condition resolved.
- Apnea (temporary cessation of breathing) and bradycardia (slowing of the heart rate) from May 13, 2001 through June 21, 2001 (Emelia) and May 21, 2001 through July 4, 2001 (Sarah), at which time the condition resolved.
- Prematurity and twin gestation (Emelia and Sarah).
- A Grade III Intraventricular Hemorrhage ("IVH") (a bleeding of the brain), periventricular leukomalacia ("PVL") (evidence of a problem with the brain tissue) and the formation of a cyst (Emelia).
- A hemangioma, i.e., a vascular skin lesion that often involutes, on her nose (Sarah).

(Def. L.R. 56.1 ¶ 90.)

Emelia was hospitalized for a total of 47 days until June 26, 2001. (Pl. L.R. 56.1 ¶ 32.)

Sarah was hospitalized for 55 days until July 4, 2001. (*Id.*) Emelia initially suffered from

respiratory distress syndrome and required endotrachael intubation and mechanical ventilation.

(Pl. L.R. 56.1 ¶ 33.) This mechanical ventilation included placing "a soft tube [in] the mouth

with no cutting and is advanced into her little windpipe, and it assists her breathing, in this case

for a short duration of two days." (Def. Resp. to Pl. L.R. 56.1 ¶ 33, quoting Muraskas dep. 25.)

Sarah suffered from similar breathing troubles and also required mechanical ventilation. (Pl.

L.R. 56.1 ¶ 34.) Without mechanical ventilation, Sarah and Emelia would not have survived.

(*Id.*)

Emelia and Sarah were both unable to feed or suckle on their own. (Pl. L.R. 56.1 ¶ 35.)

Both were fed intravenously and then through a tube in the nose or mouth. (*Id.*) Absent

mechanical feeding, the children would not have survived. (*Id.*) Emelia developed jaundice and

was placed under phototherapy to reduce the levels of bilirubin. (Pl. L.R. 56.1 ¶ 36.) She also suffered from apnea of prematurity, a condition where breathing ceases for short periods of time, leading to a fall in the heart rate. (*Id.*) She required cardiorespiratory monitoring and nearly six weeks of medication. Since their discharge and continuing to the present, both Sarah and Emelia suffer from various conditions. (Pl. L.R. 56.1 ¶ 38.) Emelia's most serious and potentially long-lasting complication is Grade III IVH, a bleeding in her brain.[3] (Pl. L.R. 56.1 ¶ 38.) Emelia also suffers from PVL, a problem with brain tissue and the formation of a cyst. (Pl. L.R. 56.1 ¶ 40.) This condition typically occurs in an area where blood has been restricted, and brain cells are destroyed by or in conjunction with the hemorrhage. (*Id.*)

Currently, it is uncertain if the children will suffer from ongoing physical, mental, or emotional impairments in the future. (Pl. L.R. 56.1 ¶ 43.) There may be long-term consequences of respiratory distress syndrome, and long-term complications of IVH can include cerebral palsy, mental retardation, motor problems, seizures, deafness, or blindness. (Pl. L.R. 56.1 ¶ 44.)

IBM, through Freeman and Freimark, was aware of Juliann's difficult pregnancy and some of the medical complications the twins were facing. (Pl. L.R. 56.1 ¶¶ 51, 57; Def. L.R. 56.1 ¶¶ 106-107.) Larimer did call Freeman at some point stating – based on an e-mail he had received from Vice President and General Manager, Lotus Amercias, Tom Millea ("Millea") dated April 13, 2001 (prior to the twins' births) – that he believed he was being singled out based

---

[3]There are four grades of IVH bleeds, with Grade IV being the most severe. (Pl. L.R. 561 ¶ 39.) Grade III bleeding can cause permanent brain damage. (*Id.*)

on his twins' medical costs. (Def. L.R. 56.1 ¶ 87.) Freeman called Millea, who could not recall the e-mail except to say that he had sent a note wishing Larimer well.[4] (*Id.*)

## IBM's Self Managed Plan

Larimer received health insurance benefits through IBM's Self Managed Plan ("Plan"). (Def. L.R. 56.1 ¶ 108.) Empire BlueCross/Blue Shield ("Empire") is the contract administrator of the Plan. (*Id.*) Empire pays the claims and provides the customer service. (*Id.*) After paying a claim, Empire submits a request to IBM to fund the claim. (Def. L.R. 56.1 ¶ 109.) Empire does not submit requests for funding on a claim-by-claim basis; rather, funding requests are based on the number of claims that have been processed within a given period of time. (*Id.*) IBM has no internal documentation regarding the payment of claims on behalf of the Larimers. (Def. L.R. 56.1 ¶ 110.) In order to determine that information, a request has to be made of Empire. (*Id.*) There is no record within IBM of the amount of medical bills incurred by the Larimers nor does IBM maintain any records about the medical bills incurred by any of its employees. (*Id.*)

---

[4] In her deposition, Freeman responded to Larimer complaint as follows:

I was absolutely shocked and didn't even know how to respond because that thought never crossed my mind that a company of 350,000 employees that–I just–I was shocked. And I told him that. And I told him that, you know, to think that anyone at Lotus or IBM would have anything but well wishes and prayers for his family I thought was just beyond me. And that note specifically says, If there is anything we can do to help, let us know.

(Def. L.R. 56.1 ¶ 87.)

## DISCUSSION

Larimer alleges in Count I that his termination violated the ADA because it was based on his association with persons with disabilities or perceived disabilities, those persons being his twin daughters. In Count II, Larimer alleges that IBM retaliated against him, in violation of § 510 of ERISA, for exercising his rights under IBM's health plan by filing for health benefits. The court addresses each Count in turn.

### A.     ADA Association Claim

The ADA prohibits discrimination against not only a qualified individual because of that individual's disability, but also against a qualified individual based on that individual's association or relationship with a person who has a known disability. 42 U.S.C. § 12112(b)(4). The Seventh Circuit has not yet addressed such an association discrimination claim under the ADA, but other courts have provided a framework for examining such claims. To establish a *prima facie* ADA association claim, a plaintiff must show that (1) he was qualified for the job at the time of the adverse employment action; (2) he was subjected to an adverse employment action; (3) he was known by his employer at the time of the adverse employment action to have a relative or associate with a disability; and (4) the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was the determining factor in the employer's decision. *Den Hartog* v. *Wasatch Acad.*, 129 F.3d 1076, 1085 (10th Cir. 1997); *Jackson* v. *Service Eng'g, Inc.*, 96 F. Supp. 2d 873, 879 (S.D. Ind. 2000); *Micek* v. *City of Chicago*, No. 98 C 6757, 1999 WL 966970, at *11 n.6 (N.D. Ill. Sept. 30, 1999). The court will begin with the threshold question of whether the twins were, in fact, disabled within the meaning of the ADA.

13

Under the ADA, a disability is either (a) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (b) a record of such impairment; or (c) being regarded as having such an impairment. 42 U.S.C. § 12102(2). Larimer argues that his daughters were disabled based on both (a) and (c) above.

To prove that the twins were disabled based on (a) above, Larimer must show (1) the twins suffered from an impairment; (2) the impairment affects major life activities; and (3) the impairment "substantially limits" such major life activities. *Bragdon* v. *Abbott*, 524 U.S. 624, 631 (1998); *Sinkler* v. *Midwest Prop. Mgmt. Ltd. P'ship*, 209 F.3d 678, 683 (7th Cir. 2000). Sufficient evidence exists in the record to show that the twins suffered from impairments while Larimer was employed at IBM, including respiratory distress syndrome, "suspected" sepsis, jaundice, apnea, and bradycardia. Thus, the court will focus its analysis on whether a substantial limitation on a major life activity exists. A major life activity is an activity of central importance to daily life. *Toyota Motor Mfg., Kentucky, Inc.* v. *Williams*, 534 U.S. 184, 197 (2002). ADA regulations provide the following representative list of major life activities: caring for oneself, performing manual tasks, walking, seeing, hearing, breathing, learning and working. *See* 29 C.F.R. § 1630.2(i). Moreover, as relevant to this case, the Seventh Circuit has expressly found eating to be a major life activity. *Furnish* v. *SVI Sys., Inc.*, 270 F.3d 445, 449 (7th Cir. 2001), quoting *Lawson* v. *CSX Transp., Inc.*, 245 F.3d 916, 923 (7th Cir. 2001) ("eating constitutes a major life activity for purposes of the ADA."). A substantial limitation is defined under ADA regulations as

> Unable to perform a major life activity that the average person in the general population can perform; or significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as

14

compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1)(i). Factors to examine when determining whether an individual is substantially limited include,

> (i) The nature and severity of the impairment;
> (ii) The duration or expected duration of the impairment; and
> (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j)(2)(i)-(iii).

Applying this ADA disability analysis to the facts of this case, there is evidence to suggest limitations on some of the twins' major life activities while Larimer was employed at IBM, particularly the ability of the twins to breath and eat. (See Pl. L.R. 56.1 ¶¶ 34-35.) As Larimer points out, conditions such as the respiratory distress syndrome, apnea and bradycardia, which both twins suffered from, affected their breathing because each twin could not breath without mechanical ventilation. (*Id.*) These breathing limitations, however, were not permanent. The respiratory distress syndrome lasted for Emelia from May 11, 2001 until May 15, 2001. For Sarah, it lasted from May 11, 2001 until May 22, 2001. (Def. L.R. 56.1 ¶ 90.) The apnea and bradycardia lasted from May 13, 2001 through June 21, 2001 for Emelia and May 21, 2001 through July 4, 2001 for Sarah.[5] It is well established under the ADA that "[d]isability does not include temporary medical conditions." *Waggoner* v. *Olin Corp.*, 169 F.3d 481, 484 (7th Cir. 1999); *Mathews* v. *Commonwealth Edison Co.*, 128 F.3d 1194, 1197 (7th Cir. 1997) ("the

---

[5]Other impairments with a short duration included suspected sepsis, which lasted from May 11, 2001 through May 14, 2001 for Emelia and May 11, 2001 through May 13, 2001 for Sarah, and jaundice, which lasted from May 12, 2001 through May 23, 2001 for Emelia and May 11, 2001 through June 7, 2001 for Sarah. Larimer is not clear as to what major life activities were affected by these impairments. No evidence is presented as to what, if any, long lasting effects these conditions may have had.

temporarily disabled are not protected by the Americans With Disabilities Act . . . ."); *Vande Zande* v. *State of Wis. Dep't of Admin.*, 44 F.3d 538, 544 (7th Cir. 1995) ("Intermittent, episodic impairments are not disabilities. . . ."); *Burns* v. *Chicago Park Dist.*, No. 99 C 3479, 2002 WL 31018363, at *1 (N.D. Ill. Sept. 9, 2002) ("To be sure, case law teaches that a purely temporary (rather than permanent or long term) impairment does not qualify as a 'disability' in ADA terms under Section 12102(2)(A)."); *West* v. *Westvaco Envelope Div.*, No. IP 00-1940-CH-K, 2002 WL 1364158, at *6 (S.D. Ind. May 28, 2002) ("The applicable regulations and relevant case law show that West's temporary and intermittent conditions do not satisfy the ADA's requirement that a condition 'substantially limit' a major life activity."); *Schumacher* v. *Communications Contractors*, 152 F. Supp. 2d 971, 976 (N.D. Ill. 2001) ("The temporary nature of Plaintiff's torn aorta precludes it from qualifying as a disability under the ADA."); *White* v. *Interior Crafts, Inc.*, No. 00 C 5067, 2001 WL 290418, *2 (N.D. Ill. March 21, 2001) ("Whatever the severity of White's impairment, it was not the type of long term impairment that would constitute a disability under the ADA."). Any impairment in breathing posed by the respiratory distress syndrome, apnea, or bradycardia did not substantially affect the twins' breathing because of the relatively short duration and because it was temporary in nature.

A similar analysis must apply when examining the life activity of eating, which Larimer specifically states was impaired. No impairment is pointed to as to why the twins could not eat on their own, but this is presumably because of their prematurity. Emelia was discharged from the hospital on June 26, 2001, and at this time she was taking her feedings by her mouth. (Def. L.R. 56.1 ¶ 91.) Moreover, Sarah was discharged on July 4, 2001, and she also was taking all nutrition orally. (Def. L.R. 56.1 ¶ 92.) As stated above, while there is evidence to suggest that

the twins' ability to eat was restricted by one or more impairments, the evidence does not support the notion that this was anything but a temporary restriction on this life activity and not a disability under the ADA.

The court must also look to the other impairments the twins suffered during the time that Larimer was employed at IBM that may have caused limitations which did not have such a short duration. At the time of their release from the hospital, Emelia suffered from Grade III IVH, PVL, prematurity and twin gestation. (Def. L.R. 56.1 ¶ 91.) Long-term consequences of IVH can include cerebral palsy, mental retardation, motor problems, seizures, deafness or blindness, although it is unclear whether such complications will apply to Emelia. (Pl. L.R. 56.1 ¶ 44.) Complications from PVL may result in cerebral palsy or learning disabilities. (Pl. L.R. 56.1 ¶ 45.) Sarah suffered from hemangioma, prematurity and twin gestation when released from the hospital (Def. L.R. 56.1 ¶ 92.), although an August 21, 2001 report by an ophthalmologist indicated that there was "no effect" on Sarah's vision as a result of the hemangioma and at the time of a developmental evaluation on November 28, 2001, Sarah's hemangioma had begun involuting and she was no longer taking medication to treat it. (Def. L.R. 56.1 ¶¶ 92-93.) Finally, respiratory distress syndrome, which both twins suffered from, may have long term effects. (Pl. L.R. 56.1 ¶ 44.)

After reviewing this evidence concerning the twins, the court concludes that insufficient evidence is presented to show that they are disabled under the ADA. At best, it is unclear whether the twins suffer from substantial limitations on major life activities. Doctors that have examined the twins have merely stated that it is uncertain whether the children will suffer from

17

ongoing physical, mental, or emotional impairments.[6]  (Pl. L.R. 56.1 ¶¶ 43.)  The best Larimer

can do, aside from conclusional statements unsupported by the record such as "These disabilities

affect life activities. . . .," (Pl. L.R. 56.1 ¶ 42.)[7], is to argue that there is the possibility of the

children's suffering long-term disabling impairments and, at present, it is unclear whether major

life activities are substantially limited.  This is insufficient to meet the definition of the term

"disabled" under the ADA.  *Sutton* v. *United Air Lines, Inc.*, 527 U.S. 471, 482 (1999) ("Because

---

[6]Dr. Robin Steinhorn, one of the twins' attending neonatologists, stated that she had no professional opinion as to whether Emelia or Sarah suffer from any long-term disabling impairments or have been substantially limited in their abilities to walk, see, hear, speak, breathe or learn.  (Steinhorn dep. at 36-42.)  Dr. Ruth Deddish, another of the twins' neonatologists, stated that as of April 2002 "both of children appeared to have no substantial issues in their development or their medical progress . . . ."  (Deddish dep. at 37.)

[7]Portions of Dr. Steinhorn's deposition that Larimer cites in support of this notion read as follows:

Q: Is there anything in this document that would indicate to you that any of the conditions that Emelia suffered from at the time of her discharge were manifesting themselves in any way?
[objection]
A: I honestly can't say one way or another
***
Q: Do you have a professional opinion as to whether Emelia or Sarah suffered from any long-term disabling impairments?
A: No
[objection]
Q: Having in mind some of the documents that we've looked at and having in mind the treatment you provided to the two children, is there any indication in your view that either child has suffered from any substantial limiation in terms of the children's ability to walk, see, hear, speak, breathe, or learn?
[objection]
A: I cannot make that assessment.
***
Q:During the time that you treated the children, was there any indication to you that during that time they suffered from any substantial limitation in terms of performing these major life activities?
***
A: I would not be able to make that assessment during hospitalization.
***
[objection]
These are premature babies.  This feels like apples and oranges to me.  You're asking me to make assessments that we can't make for premature babies.  I can describe to you what they required.  I can describe to you that they were premature, but I can't render an opinion on the specific question you asked.

(Steinhorn dep. at 36, 38-42.)

the phrase 'substantially limits' appears in the Act in the present indicative form, we think the language is properly read as requiring that a person be presently–not potentially or hypothetically–substantially limited in order to demonstrate a disability."). Excerpts of Larimer's statement of material facts are as follows,

> 44. There could be long-term consequences of respiratory distress syndrome and, without speculation, it cannot be said that there will be no long-term consequences. [citations omitted].
> 45. It is difficult to say whether Emelia will suffer abnormalities from PVL, including cerebral palsy and learning difficulties.[8] [citations omitted].
> 46. It is presently possible that the children will suffer long-term disabling impairments, affecting their ability to see, hear, speak, breathe, or learn. [citations omitted].

The ADA is not meant to deal with such possibilities or even probabilities. Larimer has no evidence that his twins have long-term impairments that substantially limit major life activities and that these impairments affecting life activities were present when Larimer was employed at IBM. The court sympathizes with the difficulty that Larimer has encountered in establishing a disability under the ADA because of the young age of the twins. Nevertheless, Larimer lacks evidence of a substantial limitation on a major life activity. As such, he cannot prove that the children are disabled on this ground.

All is not lost for Larimer's ADA claim, however, so long as he can show that IBM regarded the twins as disabled. 42 U.S.C. § 12102(2)(C). As explained by the Seventh Circuit,

---

[8]The following interchange occurred at Dr. Deddish's deposition:

Q: What are the complications associated with–long term complications associated with PVL?
A: Well, in the vast majority of cases, there are none. But certainly it is one of the predecessors for lesions in the correct place for some sort of cerebral palsy. And certainly we obviously worry about learning disabilities.

(Deddish dep. at 51.)

To fall within the statutory definition of one "regarded as disabled," the plaintiff must show that:

> (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or
>
> (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities.

*Sutton*, 527 U.S. at 480. Under either formulation described in *Sutton*, the plaintiff must show that the defendant believes she is "substantially limited" in a "major life activity." *Id.*; 42 U.S.C. § 12102(2)(A) & (C).

*Mack* v. *Great Dane Trailers*, 308 F.3d 776, 780 (7th Cir. 2002). "It is important to note that, in order to establish a 'regarded as' claim, it is not enough for a plaintiff to show that the employer knew of the plaintiff's impairment." *Amadio* v. *Ford Motor Co.*, 238 F.3d 919, 925 (7th Cir. 2001). A plaintiff must also show "that the employer believed that one or more of the plaintiff's major life activities were substantially limited by the plaintiff's impairment." *Id.*

IBM first attacks Larimer's "regarded as" claim on grounds that it is beyond the scope of Larimer's charge filed with the Equal Employment Opportunity Commission ("EEOC") and, therefore, should not be considered by the court. This argument is rejected. Larimer's charge filed with the EEOC alleged that he was discriminated against "based on [his] association with people with disabilities." (Def. L.R. 56.1 ¶ 69.) Insofar as the ADA definition of disability includes someone "being regarded as having such an impairment," 42 U.S.C. § 12102(2)(C), the EEOC charge properly identified this claim. It did not need to specifically identify this "regarded as" claim any more than it had to identify the claim that the twins were substantially limited in one or more major life activities. The definition of disability encompasses both. Moreover, even if it did not, this claim would properly be like or reasonably related enough to the EEOC charge

for the court to address it. *See McKenzie* v. *Illinois Dep't of Transp.*, 92 F.3d 473, 481-82 (7th Cir. 1996).

Next, IBM argues that the evidence does not support the notion that anyone at IBM ever regarded the children as disabled. The court agrees. There is no dispute that both Freimark and Freeman were aware of the complications with Juliann's pregnancy, that the children were born prematurely, and that they were in the hospital with medical complications. (Pl. L.R. 56.1 ¶¶ 51-52, 57.) As mentioned above, however, simply being aware of any one impairment is not enough. Freeman and Freimark were required to have had a mistaken belief as to a substantial limitation on a major life activity, or a mistaken belief that a non-limiting impairment substantially limited a major life activity. Larimer's proof does not support such beliefs on the part of Freeman and Freimark. Larimer fails even to state which major life activity Freeman and Freimark regarded as substantially limited. His proof shows nothing more than that Freeman and Freimark were aware of the complications. Accordingly, the court rejects the claim that IBM regarded the twins as disabled.

Because Larimer fails to establish that the twins were either substantially limited in a major life activity or that IBM regarded them as such, he cannot show that they were disabled under the ADA. The ADA association claim, therefore, must fail. Summary judgment is granted in favor of IBM on the Count I claim.

## B.    Retaliation under ERISA

Larimer contends that his termination was in violation of § 510 of ERISA because it was in retaliation for his filing health care claims for his daughters. Section 510 of ERISA, 29 U.S.C. § 1140, prohibits an employer from discharging an employee "for the purpose of interfering with

the attainment of any right to which [a plan] participant may become entitled" under an employee benefit plan. These substantive rights can be enforced pursuant to § 502 of ERISA, 29 U.S.C. § 1132, specifically, § 502(a)(3), which encompasses civil actions such as this one for violations of ERISA itself. 29 U.S.C. § 1132(a)(3); *Powell* v. *A T & T Communications, Inc.*, 938 F.2d 823, 825 (7th Cir. 1991).

IBM first argues that Larimer's ERISA claim should be dismissed because he failed to exhaust administrative remedies that were available to him. While neither § 502 nor § 510 speak to whether exhaustion of administrative remedies is a prerequisite to a civil action under ERISA, the "rule in this court is clear: the decision to require exhaustion as a prerequisite to bringing suit is a matter within the discretion of the trial court . . . ." *Powell*, 938 F.2d at 825, citing *Dale* v. *Chicago Tribune Co.*, 797 F.2d 458, 466 (7th Cir. 1986), *cert denied*, 479 U.S. 1066, citing *Kross* v. *Western Elec. Co.*, 701 F.2d 1238, 1244-45 (7th Cir. 1983). "As a general rule, an ERISA plaintiff must exhaust all available administrative remedies, but the requirement is relaxed in two instances: when a plaintiff is denied meaningful access to administrative procedures and when exhaustion would prove futile." *Adamczyk* v. *Lever Bros. Co.*, 991 F. Supp. 931, 934 (N.D. Ill. 1997).

Larimer admits that he received a copy of a Summary Plan Description pertaining to his health plan at IBM. (Def. L.R. 56.1 ¶ 68.) This Plan contains a procedure through IBM's Human Resources Service Center to raise questions or claims in connection with the Plan. (*Id.*) IBM maintains that Larimer did not follow any such procedure and, therefore, did not fulfill his administrative requirements. Neither party presents the court with information on exactly how

22

Larimer was supposed to exhaust any administrative remedies, although their appears no disagreement that such administrative exhaustion remedies did exist.[9]

Larimer's main argument in response refers to IBM's position as "preposterous" because Larimer is not suing the self-funded health plan for coverage but instead is suing his employer for an ERISA violation for denial of benefits. Larimer cites *Powell*, 938 F.2d at 825, as support. In fact, *Powell*, along with numerous other decisions of the Seventh Circuit, cut against Larimer's view. In *Powell*, a former employee sued his former employer alleging that he was discharged because the employer wanted to avoid paying his medical insurance and disability benefits in violation of § 510. *Id.* at 824. The plaintiff in *Powell* specifically brought suit against his former employer, A T & T, and not any Benefit Plan at issue. *Accord Lindemann* v. *Mobil Oil Co.*, 79 F.3d 647, 649-50 (7th Cir. 1996); *Kross*, 701 F.2d at 1244-45; *Lapka* v. *Juno Lighting, Inc.*, No. 96 C 6591, 1998 WL 102714, at *2 (N.D. Ill. March 3, 1998). The court in *Powell* noted "[w]e take this opportunity to reaffirm this court's notion that a district court may properly require exhaustion of administrative proceedings prior to the filing of a claim involving an alleged violation of an ERISA statutory provision." *Powell*, 938 F.2d at 825. Thus, the court rejects Larimer's claim that he is excused from exhausting any Plan remedies because he is suing his employer.

In his response to IBM's statement of material facts, Larimer alleges that he exhausted any remedies because he called IBM's Human Resources Service center to make a "claim"

---

[9]IBM cites to Larimer dep. ex. 2, at P0527-28 as the provisions of the Plan requiring exhaustion. For whatever reason, IBM's exhibit contains only the odd numbered pages of this Plan. Therefore, the court only has P0527 before it, which, with the possible exception of the statement "You have the right to have the plan review and reconsider your claim," contains little mention of what procedure exists for review of claims in connection with the Plan. Inasmuch as Larimer admits that such a procedure exists, the court will assume that it does.

before a "panel review." (Pl. Resp. to Def. L.R. 56.1 ¶ 68.) IBM claims that his panel review

dealt not with the ERISA plan but instead was part of IBM's appeal program, whereby an

employee may choose to file a grievance within 90 days concerning, among other things,

discrimination or dismissals. In his paperwork on this claim, Larimer stated that he had been

"[u]nfairly terminated. Not given honest communication regarding reasons. Not given honest

opportunity to correct/address given reasons. Not given reasonable time frame to perform due to

personal situation/demands." (Def. Appx. Ex. 25.) For purposes of this motion, the court

believes this claim sufficiently exhausted Larimer administrative remedies. Although IBM

argues that this "panel review" comprised of IBM employees was unrelated to ERISA, the court

simply does not have enough evidence before it to distinguish between this type of claim before

the panel review or one brought under ERISA. Moreover, Larimer's panel review necessarily

incorporated the reason that Larimer believed his was fired, *i.e.*, discrimination based on his

children's condition and the expenses that would be associated with them. Larimer likely would

have presented the same arguments before any separate review under ERISA, if, in fact, a

separate review was required, and it is likely that the same decision would have been reached,

resulting in nothing more than a delay in the ultimate resolution of this case. Accordingly, the

court rejects this argument.

Turning to the merits of Larimer's retaliation claim, to prove a violation of § 510,

Larimer must establish more than a loss of benefits; he must show that IBM terminated him with

"the specific intent of preventing or retaliating for the use of benefits." *Lindemann*, 141 F.3d at

295; *Little* v. *Cox's Supermarkets*, 71 F.3d 637, 642 n.3 (7th Cir. 1995). Larimer must show that

"a desire to frustrate [his] attainment or enjoyment of benefit rights contributed toward [IBM's]

decision . . . ." *Teumer* v. *General Motors Corp.*, 34 F.3d 542, 550 (7th Cir. 1994). Larimer does not point to any direct evidence of retaliation under § 510. Thus, he proceeds using a modified version of the indirect method of proof under *McDonnell Douglas* v. *Green*, 411 U.S. 792 (1973). To establish a *prima facie* case under § 510, Larimer must show that he (1) belongs to the protected class; (2) was qualified for his job position; and (3) was discharged or denied employment under circumstances that provide some basis for believing that the prohibited intent to retaliate was present. *Grottkau* v. *Sky Climber, Inc.*, 79 F.3d 70, 73 (7th Cir. 1996); *Little*, 71 F.3d at 642. If Larimer were to meet his *prima facie* case, the burden would shift to IBM to offer a legitimate and non-discriminatory reason for the employment action. *Grottkau*, 79 F.3d at 73. If IBM were to make this showing, the burden would shift back to Larimer to show that IBM's proffered reason was a pretext. *Id.*

Inasmuch as not performing the essential functions of a job may shed light on whether an employee is qualified for a position, *see McPhaul* v. *Board of Comm'rs*, 226 F.3d 558, 563 (7th Cir. 2000), it is certainly questionable whether Larimer would pass part 2 of his *prima facie* case. Larimer admits that Freeman discussed deficiencies in his performance with him, that he was still learning the tools and processes of IBM as early as April 2001, that he conceded his performance was not where it needed to be and that he disappointed Freimark by the way he handled a proposal on one of his accounts, sold on price rather than quality, searched company records to take credit on sales, lacked a sales "pipeline," did not have access to people in power at his accounts, and was not able to sell solutions to his customers. Moreover, after the August 2001

25

meeting, both Freimark and Freeman were disappointed with Larimer's presentation and both realized that he was not meeting or understanding the critical business needs of his clients.[10]

Even if the court were satisfied that Larimer was qualified for the position, no reasonable trier of fact could find that he was discharged under circumstances that provide some basis for believing that the prohibited intent to retaliate was present. Indeed, the evidence to the contrary is far more substantial, as evidence suggests that IBM employees showed only concern for Larimer and his wife's coverage under IBM's health policy. Juliann Larimer testified that a conversation she had asking whether she was still covered under husband's plan was, in her belief, out of concern that she did not lose coverage. (Def. L.R. 56.1 ¶ 85.) When Freimark gave Larimer the option of the performance plan or a severance package, he stated that the severance package would best meet his health care concerns and that he was aware that health insurance was important for him. (Def. L.R. 56.1 ¶ 46.) Larimer himself took this to mean that Freimark was implying that the severance package would best meet his health coverage concerns. (*Id.*) Furthermore, Juliann Larimer admitted that attempts were made after her pregnancy to find her a new job at IBM, which would have continued coverage for the Larimers. (Def. L.R. 56.1 85-86.) Such evidence certainly contradicts the notion that the costs of health coverage for the twins was the reason Larimer himself was fired. Finally, no evidence is presented that Freimark, Freeman or anyone at IBM had knowledge as to the amount of health claims being incurred, as such information was in the hands of Empire. Simply put, there is no evidence that IBM considered or relied on medical issues, much less that it had the specific intent of retaliating against Larimer for

---

[10]This evidence would also be relevant to a legitimate nondiscriminatory reason for Larimer's termination, that being IBM's dissatisfaction with his performance. While Larimer maintains that the record "reeks" of pretext, he presents no persuasive reason other than his belief that his performance was excellent.

using such benefits. Summary judgment is granted in favor of IBM on the Count II retaliation claim under ERISA.

## CONCLUSION

For the reasons stated above, IBM's motion for summary judgment is granted [#30.] The clerk is instructed to enter judgment in favor of the defendant. All future dates, including the May 19, 2003 trial date, are stricken. This case is terminated.

ENTER: _____
JOAN HUMPHREY LEFKOW
United States District Judge

Dated: April 29, 2003